CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 2 7 2006

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

FAITH S. HUDSON,          )
                             )
      Plaintiff,       )
                             )     Civil Action No. 7:05cv00588
v.                       )
                             )
JO ANNE B. BARNHART,    )  By:  Michael F. Urbanski
Commissioner of Social Security,  )       United States Magistrate Judge
                             )
      Defendant.    )
                             )

## MEMORANDUM OPINION

Plaintiff Faith S. Hudson ("Hudson") brought this action for review of the decision of the

Commissioner of Social Security denying her claim for disability insurance benefits ("DIB") and

supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act, 42

U.S.C. §§ 401-433, 1381-1383. The parties have consented to the undersigned Magistrate

Judge's jurisdiction over this matter, and the case is before the court on cross motions for

summary judgment. Having reviewed the record, and after briefing and oral argument, the case

is now ripe for decision. As the ALJ's decision is amply supported by evidence in the record, it

must be affirmed.

I

Plaintiff was born on April 12, 1959, and received her general education diploma.

(Administrative Record, hereinafter "R." at 13, 48, 304) Plaintiff has no vocationally relevant

past work experience. (R. 13) Plaintiff filed applications for DIB and SSI with a protective

filing date of December 26, 2002, alleging she became disabled on September 30, 1988, due to

nerves, high blood pressure, swelling of the legs, osteoporosis, arthritis, ulcerative colitis,

asthma, and removal of a cyst on her brain. (R. 12, 13, 58) Plaintiff's claims were denied at both

the initial and reconsideration levels of administrative review, (R. 12), and an administrative

hearing was held before an administrative law judge ("ALJ") on August 31, 2004. (R. 293-344)

On March 25, 2005, the ALJ issued a decision denying plaintiff's claims for DIB and SSI,

finding plaintiff retained the residual functional capacity ("RFC") to perform a significant range

of light work in jobs that require no climbing, bending or stooping, and that permit the claimant

to sit and stand as needed. (R. 19) The ALJ further limited plaintiff to jobs involving the

performance of simple, repetitive tasks that require minimal contact with the public. (R. 19)

The ALJ's decision became final for the purposes of judicial review under 42 U.S.C.

§ 405(g) on July 23, 2005, when the Appeals Council denied plaintiff's request for review.

(R. 5-7) Plaintiff then filed this action challenging the Commissioner's decision.

## II

Plaintiff contends that the ALJ erred in a number of ways. Specifically, plaintiff argues

that the ALJ failed to properly consider the consultative opinions of Mohammed Athar, M.D.,

and Harry G. Padgett, Ed.D., that plaintiff is unable to perform work outside of the home.

Hudson also claims the ALJ erred in her consideration of the medical evidence of record, and

plaintiff takes issue with the ALJ's credibility determination. Finally, plaintiff alternatively

requests that the court remand this case to the Commissioner for consideration of new evidence

under sentence six of 42 U.S.C. § 405(g).

The court's review is limited to a determination as to whether there is substantial

evidence to support the Commissioner's conclusion that plaintiff failed to meet the conditions for

entitlement established by and pursuant to the Act. If such substantial evidence exists, the final

2

decision of the Commissioner must be affirmed. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990); Laws v. Celebrezze, 368 F.2d 640 (4th Cir. 1966). Stated briefly, substantial evidence has been defined as such relevant evidence, considering the record as a whole, as might be found adequate to support a conclusion by a reasonable mind. Richardson v. Perales, 402 U.S. 389, 401 (1971).

### III

Though plaintiff filed a claim for disability insurance benefits, she has failed to provide evidence establishing her entitlement to such benefits. To qualify for DIB, plaintiff must establish that she became disabled on or before her date last insured. See 42 U.S.C. §§ 423(a)(1)(A), (c)(1). Plaintiff's date last insured is September 30, 1988; however, no medical evidence of record establishes disability on or before that date. At oral argument, plaintiff sought and was granted additional time to present evidence establishing disability as of 1988. However, Hudson has failed to produce any such evidence. On July 18, 2006, plaintiff filed an affidavit with additional medical records dating from July 2, 1998 to September 11, 1998. These records have no bearing on the issue of plaintiff's eligibility for DIB, and plaintiff concedes she has not produced evidence of disability prior to her date of last insured. The ALJ's determination that plaintiff has not met the required showing for disability benefits under Title II of the Social Security Act is supported by substantial evidence.

### IV

Regarding her claim for SSI benefits, Hudson makes a number of arguments to support her contention that the ALJ erred in determining she is not disabled under the Act. For the

3

reasons outlined below, the undersigned finds the ALJ's opinion amply supported by evidence of record.

### A. The Consultative Examiners' Opinions Are Not Entitled To Great Weight.

Hudson argues the ALJ improperly discounted the opinions of both consultative examiners that plaintiff is incapable of work outside of the home. Harry G. Padgett, Ed.D., performed a consultative psychological examination of plaintiff on March 10, 2003. (R. 183-88) He concluded that no evidence suggests "that the examinee could be productive in a regular job at this time." (R. 187) Dr. Padgett further determined that plaintiff is overloaded with anxiety and needs continuous contact with her psychiatrist. (R. 188) On March 21, 2003, Mohammed Athar, M.D., performed a physical disability evaluation on plaintiff. (R. 192-98) At the end of his examination, Dr. Athar concluded "I do not feel that she will be able to do any kind of work outside her home. Based on my examination, I feel that she has minimal impairment in her ability to sit, but she stated that standing and walking for any length of time seem to aggravate her breathing and also aggravates the back pain." (R. 198)

The ALJ found Dr. Athar's conclusory opinion not to be credible, as his physical examinations performed on plaintiff revealed no significant positive findings. (R. 17) Indeed, the ALJ noted that all of the "diagnoses" listed by Dr. Athar were provided by plaintiff, "either orally or in past medical records given to him for review." (R. 17) Additionally, the ALJ found the consultative psychologist's opinion that plaintiff would not be productive in a regular job incredible in light of the activities Hudson reported, which contradict her allegations of severe anxiety and depression. (R. 17)

4

Substantial evidence supports the ALJ's finding regarding these consultative examinations, as neither opinion is supported by objective clinical findings. Dr. Athar's conclusion is based fundamentally on plaintiff's subjective complaints. The physician's examination revealed normal breath sounds, a regular heart rate and rhythm, no tenderness on palpation of the abdomen, and no erythema or effusion of the spine. (R. 196) Dr. Athar observed tenderness on palpation of the lumbosacral spine, and plaintiff's range of motion of the spine was forward flexion 80 degrees. (R. 197) Plaintiff had no erythema or effusion in the hips or knees, and her range of motion was within normal limits. (R. 197) Though she exhibited tenderness on palpation of the shoulders, range of motion in both shoulder joints was within normal limits. (R. 197) Plaintiff had good strength in both her hands and legs, and range of motion of all other joints was within normal limits. (R. 197) Dr. Athar noted plaintiff had a minimal impairment in her ability to sit. (R. 198) Yet he found Hudson physically incapable of working outside of the home based on her reports of an inability to complete household chores, getting "all worked up" due to nervousness, and aggravated back pain and "breathing" due to standing or walking for any length of time. (R. 198)

Likewise, Dr. Padgett's conclusion that no evidence suggests plaintiff could be a productive employee is not supported by his objective clinical findings. While her Vineland Adaptive Behavior Scale indicated she had serious limitations in her adaptive behavior, Hudson exhibited fair reality contact, appropriate emotional content and good immediate memory. (R.185) Plaintiff displayed serious difficulty with her remote memory, though her recent memory was adequate. (R. 186) She had a limited fund of information, but she showed some abstract reasoning ability and good mathematical reasoning. (R. 186) She read at a post-high

5

school level and appeared to be functioning intellectually in the upper limits of the low average range. (R. 186) Notably, the psychologist concluded that plaintiff "related well to the psychologist and would probably relate well to most people." (R. 187)

Dr. Padgett noted plaintiff was overloaded with anxiety and in need of continuous contact with her psychiatrist. (R. 188) However, at the time of this consultative examination, plaintiff had not been treated by a mental health professional in nearly four (4) years. (R. 321) In her last visit to Crossroads Behavioral Healthcare on April 22, 1999, notes indicate she had become so stable that she need only return for visits yearly. (R. 98) Additionally, Dr. Griffin of Crossroads noted that her major depressive disorder was in complete remission and her acute stress disorder was "essentially now resolving." (R. 100) Office notes indicate that she made excellent eye contact and appeared glad to see the examiner; she was described as kind, charitable and thoughtful. (R. 100) Dr. Griffin stated she had excellent insight and seemed to have resolved satisfactorily through a recent, traumatic automobile accident, in which she ran over a man who had fallen from his horse. (R. 101) Between her last visit to Crossroads Behavioral and the date of Dr. Padgett's consultative exam, her treating physician never referred her for mental health treatment, and plaintiff testified that her panic attacks were controlled with the medication prescribed for her. (R. 321-22)

Though both consultative examiners concluded Hudson would have difficulty working outside of the home, the ultimate determination of disability is reserved to the Commissioner. 20 C.F.R. § 416.927(e)(1) ("A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled."). Medical sources are to provide evidence regarding the nature and extent of a claimant's impairments. 20 C.F.R.

6

§ 416.927(e)(2). In this case, the opinions of Padgett and Dr. Athar lack objective clinical findings to support a determination of disability.

Additionally, regulations provide that the Commissioner give more weight to opinions rendered by treating sources than to reports from individual examinations, such as consultative examinations. 20 C.F.R. § 416.927(d)(2). Plaintiff correctly argues that a consultative examination is, by its nature, of short duration, and should not be disregarded for that reason. (Pl.'s Br. 8)  However, the ALJ is entitled to accord less weight to a one-time opinion pursuant to the regulations. Plaintiff's treating physicians never opined that she is disabled from all work.

The consultative examiners' conclusions are also inconsistent with Hudson's reported activities. Plaintiff helps home school her daughter, attends church, and drives occasionally. (R. 184)  She grocery shops with her husband, (R. 184, 319), does the laundry two to three times per week, (R. 320, 330, 331), sweeps the floor, (R. 327), and cooks once in awhile, (R. 329). Additionally, she puts dishes in the dishwasher and washes the rest by hand, including the pots and pans. (R. 330)  Hudson stated she is able to concentrate on computer games for an hour at a time. (R. 335)  Plaintiff also frequently visits family members, including her mother-in-law on the weekends, her grandchildren a few times per month, and her brother-in-law daily. (R. 333, 338)

For these reasons, the ALJ's determination that the opinions of the consultative examiners are not sufficiently supported to be accorded controlling weight is supported by substantial evidence.

7

**B. Medical Evidence Supports a Finding of Not Disabled.**

Plaintiff alleges in her brief that the ALJ "has overlooked practically all of the medical records and disregarded a substantial portion of the evidence of the claimant to reach her decision of not disabled." (Pl.'s Br. 11)  The undersigned disagrees and finds the ALJ's determination of plaintiff's residual functional capacity supported by substantial evidence of record.

The ALJ determined that plaintiff has the residual functional capacity for a significant range of light work, including lifting no more than twenty (20) pounds occasionally and ten (10) pounds frequently.  (R. 18)  The ALJ also limited plaintiff to work that permits Hudson to sit and stand as needed with no climbing, bending or stooping.  (R. 19)  The ALJ restricted plaintiff to jobs involving the performance of simple, repetitive tasks with minimal contact with the public, in order to account for Hudson's mental impairments.  (R. 19)

The ALJ's RFC determination coincides with that of the state agency physicians.  In a physical residual capacity assessment completed on July 25, 2003, Perry A. Caviness, M.D., found plaintiff capable of occasionally lifting twenty (20) pounds and frequently lifting ten (10) pounds, as well as standing, walking and sitting six (6) hours.  (R. 224)  This physical RFC assessment was even more restrictive than one completed by Dr. Tomlinson on April 4, 2003, where plaintiff was found to have the capacity to lift fifty (50) pounds occasionally and twenty-five (25) pounds frequently.  (R. 250)

In the record, Dr. Caviness noted that he was unable to evaluate plaintiff for DIB under Title II of the Social Security Act due to insufficient evidence.  (R. 230)  He further noted with regards to her Title XVI claim that she had a light physical RFC with additional limitations. (R. 230)  Hudson argues that the doctor erroneously failed to define these "additional"

8

limitations. (Pl.'s Br. 8)  Contrary to plaintiff's assertion, Dr. Caviness thoroughly outlined these limitations in his assessment, noting plaintiff can balance, stoop, and crouch occasionally; never climb stairs; and frequently kneel and crawl.  (R. 225)  He also indicated Hudson should avoid even moderate exposure to fumes, odors, dusts, gases and poor ventilation; and she should avoid all exposure to hazards, including machinery and heights.  (R. 227)

Additionally, the ALJ's RFC determination is supported by both a Psychiatric Review Technique and Mental RFC Assessment.  In the Psychiatric Review Technique, plaintiff was not restricted in her activities of daily living; she had only mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace.  (R. 241) In her Mental RFC Assessment on April 9, 2003, plaintiff was noted to be moderately limited in ten (10) areas of functioning, including understanding and carrying out detailed instructions, maintaining concentration for an extended period of time, working in coordination with others or interacting with the general public, and completing a normal workweek without interruption from psychologically based symptoms.  (R. 245-46)  Plaintiff was not significantly limited in any of the other ten (10) areas of functioning, and she was not categorized as markedly limited in any domain.  (R. 245-46)  Ben Williams, Ph.D., remarked that Hudson would be able to remember and carry out simple, two-step instructions; adequately relate to supervisors, co-workers and the public; and adequately function in a stable, low-stress, non-production-oriented work environment.  (R. 247)

Though plaintiff claims a long list of disabling impairments, no medical evidence suggests that these impairments, either individually or combined, render her unable to work. Plaintiff states she cannot work because of her nerves.  (R. 312)  She testified at her

9

administrative hearing that she has had panic attacks three (3) to four (4) times per week since 1980. (R. 312) However, she has not seen a mental health professional since 1999. (R. 98-104, 321) Plaintiff complains of lacking the funds for further psychological treatment, (Pl.'s Br. 7), yet records indicate she had no need for continuous treatment because her mental health was so stable. (R. 100) Indeed, records of Crossroads Behavioral Healthcare from April of 1999 describe plaintiff as a patient who only needs to be seen once per year "because she is so stable." (R. 100) Her major depressive disorder was in complete remission, and she seemed to be doing well on her prescription Imipramine. (R. 98) She made excellent eye contact with the examiner and showed excellent insight. (R. 100, 101) Her global assessment of functioning ("GAF") level was 65-70.[1] (R. 101) Despite her involvement in a fatal accident just one month prior to this mental health examination, Dr. Griffin indicated plaintiff exhibited only mild difficulty in functioning. (R. 99-101)

Plaintiff's treating physician did not refer plaintiff to a mental health professional from 1999 to the time the ALJ rendered her opinion. Plaintiff indicated in her administrative hearing testimony that her medication helps alleviate her problems, as it works within fifteen (15) minutes of the onset of a panic attack. (R. 313) Plaintiff further stated she does not want to see another doctor. (R. 321-22)

---

[1] The GAF scale is a method of considering psychological, social and occupational function on a hypothetical continuum of mental health. The scale ranges from 0 to 100, with serious impairment in functioning at a score below 50, moderate difficulty in functioning at 60 or below, some functioning difficulty at 70 and below, and so forth. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994). A score of 65-70 indicates that an individual displays some mild symptoms or difficulty in social, occupational, or school functioning, but generally functions pretty well with some meaningful interpersonal relationships. Id.

10

While Hudson correctly points out that Dr. Athar lists bipolar disorder as a diagnosis in his consultative examination report, none of his clinical findings support such a diagnosis. Instead, this diagnosis seems to be based upon Hudson's report that she was diagnosed with bipolar disorder in 1980, as well as her subjective complaints of mood swings, in which she claims to vacillate between being happy and being depressed and "worked up." (R. 192)

Dr. Padgett's report also lists bipolar II disorder as a diagnosis. (R. 187) Even if there were objective findings to support a diagnosis of bipolar disorder, no evidence suggests that the impairment is disabling in plaintiff's case. Plaintiff stated that her medication adequately controls her attacks, and she is not interested in seeing another doctor. (R. 321-22) Additionally, her treating physician never felt the need to refer her to a mental health professional. Crossroads Behavioral notes from 1999 indicate plaintiff's depression was in complete remission. (R. 98-101)

After the removal of a colloidal cyst from plaintiff's third ventricle in November of 2002, doctors reported she did very well post-craniotomy, and she was given ibuprofen for occasional headaches. (R. 170) An MRI of her brain taken on June 4, 2003 showed no evidence of a residual tumor. (R. 204) Plaintiff testified that her headaches improved after this surgery, though she complained of having some trouble with her word choice and doing arithmetic in her head. (R. 320-21) Plaintiff now visits her neurosurgeon just once per year. (R. 323)

The record indicates plaintiff's hypertension is stable and controlled with medication, and has not proven to be disabling in any way. (R. 107, 112, 114, 116, 170, 174, 180) She did suffer from increased hypertension in March of 2003, following a dramatic increase in her sodium intake due to her consumption of a gallon of pickles and pickle juice per week. (R. 211) After

11

being advised that this pickle consumption was bad for her blood pressure, (R. 210), she

reluctantly agreed to decrease her intake of pickle juice. (R. 209) Subsequent notes reveal

several normal blood pressure readings. (R. 209)

Similarly, Hudson's ulcerative colitis, for which she takes Zantac 300 m.g. and Tums,

(R. 315), seems to be well controlled. (R. 100) No medical evidence indicates otherwise.

Plaintiff testified that she is weak due to osteoporosis, which she says runs in her family.

(R. 316) A bone density study completed on June 25, 2002 revealed normal bone density in the

hip region, though there was evidence of bone mineral density loss of the spine in the range of

osteopenia, which had worsened since August of 1999. (R. 144) As a result, Hudson was

prescribed 70 m.g. of Fosamax weekly. (R. 176) A subsequent bone density study taken on

August 5, 2004 was normal, placing plaintiff at an average risk for fracture. (R. 272) The

impression revealed an interval increase in bone mineral density in the lumbar spine, as well as in

both hips, as compared to the baseline scan in August of 1999. (R. 272)

Though she complained of back and leg pain, x-rays of plaintiff's lumbar spine, left hip

and knee were essentially unremarkable. (R. 218) An MRI of the lumbar spine revealed

minimal degenerative changes at L5-S1 with mild left neural foraminal stenosis. (R. 219) In an

examination on June 12, 2003, William Johnson, D.O., of Tri-County Orthopedics noted

Hudson's ranges of motion were limited, though her MRI showed only minimal degenerative

change at L5-S1. (R. 215) She was diagnosed with degenerative disc disease and right-sided

radiculopathy. (R. 215) Dr. Johnson recommended therapy. (R. 215) When she returned on

July 28, 2003, she reported significant improvement in her back and leg pain as a result of this

therapy. (R. 261) Plaintiff stated she would continue on home therapy and felt she had

12

significantly improved. (R. 261) Dr. Johnson noted "she seems to be doing very well," and he prescribed over the counter anti-inflammatories for pain flare-ups. (R. 261)

Contrary to plaintiff's assertions, the ALJ did not disregard the medical evidence. Instead, the evidence of record simply fails to establish that plaintiff's impairments, either individually or combined, are disabling. As such, the ALJ's decision is supported by substantial evidence.

### C. The ALJ's Credibility Determination Was Properly Explained and Supported by the Record.

Plaintiff alleges the ALJ erred in her credibility determination. In reviewing cases for substantial evidence, courts must not undertake to "re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citing Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990)). It is well settled that credibility determinations are in the province of the ALJ, and that courts normally ought not interfere with those determinations. See Hatcher v. Sec'y of Health & Human Servs., 898 F.2d 21, 23 (4th Cir. 1989). The ALJ is not required to accept all subjective testimony at face value. See Hays, 907 F.2d at 1456. Because the ALJ had an opportunity to observe plaintiff's demeanor and to determine her credibility, her observations are to be afforded great weight. Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984).

Plaintiff argues the ALJ failed to outline what evidence she found credible and what she found incredible. The Fourth Circuit has held that the ALJ's decision should refer specifically to the evidence informing the ALJ's determination. Hatcher, 898 F.2d at 23. In this case, the ALJ stated:

13

> In reaching this conclusion regarding the claimant's RFC, the
> undersigned has considered the claimant's testimony regarding her
> subjective allegations of disabling pain and other symptoms, but finds
> her testimony less than fully credible because her allegations are
> excessive and not fully supported by the evidence of record.

(R. 16) The ALJ then examined plaintiff's allegations in light of the evidence of record, noting

that the medical evidence does not support plaintiff's subjective complaints of disabling

impairments. (R. 16) The ALJ specifically addressed the lack of medical evidence supporting

plaintiff's claim of asthma. (R. 16) Additionally, the ALJ noted there is no current evidence that

her ulcerative colitis and reflux disease are symptomatic. (R. 16) The ALJ correctly pointed out

that despite a diagnosis of osteoporosis, Hudson's bone density study was normal; in addition,

she failed to complain of severe headaches after her brain surgery. (R. 16) Her hypertension

remained under control with medication, and her alleged back pain improved with conservative

treatment. (R. 16-17) Giving the plaintiff the benefit of the doubt, the ALJ concluded she could

perform light work that allows her to sit and stand as needed. (R. 17) The undersigned finds the

ALJ's credibility determination amply explained.

Furthermore, the ALJ's finding that plaintiff's testimony is less than fully credible is

supported by the record. While plaintiff testified that she was weak due to osteoporosis,

(R. 316), she told the ALJ that she can lift a gallon of milk. (R. 318-19) She also stated she is

able to lift her "smaller" grandchildren. (R. 332-33) Dr. Johnson noted that plaintiff's

complaints of weakness were not demonstrated on examination. (R. 218) Plaintiff also

complained of a "dislocated disc" in her back, (R. 327), yet her x-rays were unremarkable and

her MRI showed mild degenerative disc disease. (R. 218-219) Plaintiff further stated that

14

Medical Associates of Surry prescribed a cane for her, (R. 306-07), yet records do not establish such a prescription.

Plaintiff told consultative psychologist Dr. Padgett that she has been unable to enjoy crafts such as crocheting, embroidery and candle wicking, since her brain surgery. (R. 184) Yet at her administrative hearing, Hudson told the ALJ that she no longer participated in these craft activities because her "mother used to do crafts all the time, and since I lost her I can't seem to get back into my crafting." (R. 334) Though she claims to have agoraphobia, (R. 326), the consultative psychologist noted plaintiff would relate well to most people, (R. 187), and mental health records indicate a diagnosis of acute stress disorder, superimposed upon panic disorder, *without* agoraphobia. (R. 100) Plaintiff also complained of memory and concentration problems, (R. 321), yet she testified that she is able to sit and play computer games for one hour per day. (R. 335)

Record evidence does not support plaintiff's long list of allegedly disabling impairments, rendering plaintiff's allegations less than fully credible. Accordingly, the ALJ's credibility determination is supported by substantial evidence.

V

As an alternative to holding the ALJ erred in finding plaintiff not disabled, Hudson requests that the court remand this case under sentence six of 42 U.S.C. § 405(g) for consideration of new evidence. Sentence six authorizes the court to remand a case to the Commissioner upon a showing of new, material evidence, for which good cause can be shown for the failure to incorporate such evidence into the record in a prior proceeding. 42 U.S.C. § 405(g); Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985). Sentence six applies

15

specifically to evidence not incorporated into the record by either the ALJ or the Appeals Council. For the reasons outlined below, the evidence submitted to the court for consideration by plaintiff does not meet the standard outlined in <u>Borders</u> and thus, a remand is not warranted in this case.

The Fourth Circuit in <u>Borders</u> held that a reviewing court may remand a case to the Commissioner on the basis of newly discovered evidence if four prerequisites are met. <u>Borders</u>, 777 F.2d at 955. First, the evidence must relate back to the time the application was first filed, and it must be new, in that it cannot be merely cumulative. <u>Id.</u>; <u>see also</u> <u>Wilkins v. Sec'y, Dep't Health & Human Servs.</u>, 953 F.2d 93, 96 (4th Cir. 1991). The evidence must also be material to the extent that the Commissioner's decision might reasonably have been different had the new evidence been before her. <u>Borders</u>, 777 F.2d at 955. There must be good cause for the claimant's failure to submit the evidence when the claim was before the Commissioner. <u>Id.</u> Finally, the claimant must present to the remanding court at least a general showing of the nature of the new evidence. <u>Id.</u>

Plaintiff has met the fourth step of the <u>Borders</u> test in this case, as plaintiff has provided the court with the evidence to be considered on remand and the court understands its nature. <u>See</u> <u>Borders</u>, 777 F.2d at 955. As regards good cause, the additional records submitted by plaintiff span from July 2, 1998 to July 11, 2006. Plaintiff produced affidavits on February 7, 2006, May 31, 2006 and July 18, 2006, asserting the records submitted therewith were unavailable when the case was before the Commissioner. While good cause may be shown for plaintiff's failure to file records of medical care rendered after the July, 2005 Appeals Council decision, Hudson has failed to show good cause as to why other medical records dated prior to July, 2005 were not

16

submitted to the Commissioner earlier. Plaintiff simply does not explain why these records were previously "unavailable."

To the extent that good cause may be shown, plaintiff still has not met all the requirements of Borders. Plaintiff has failed to establish the relevance of certain records to the time period at issue in this case. Both the February 6, 2006 and February 9, 2006 records are from examinations which took place nearly one year after the date of the ALJ's decision. Plaintiff's most recent submission, records from July 11, 2006, are from an office visit that occurred well over one year after the ALJ rendered her decision. Despite this relevance issue, none of the records submitted for the court's review satisfy the new and material aspects of the Borders test and do not warrant remand under sentence six.

Plaintiff submitted records containing the following evidence. In June of 2003, plaintiff had two small cysts behind her ear, and an August, 2004 mammogram revealed a benign nodule in plaintiff's left breast. Hudson complained of foot cramps in July of 2004 and September of 2005.

She complained of sinusitis, coughing and congestion on a number of occasions, including August 27, 1998, September 11, 1998, July 7, 2003, November 26, 2004, December 1, 2004, December 17, 2004, January 4, 2005, March 4, 2005, and July 11, 2006 Yet, throughout this time period, plaintiff remained a smoker and stated to Dr. Hooks on January 4, 2005 that she has a brain tumor and decided that something is "going to get her and it might as well be cigarettes." Office notes indicate plaintiff was quick to blame poinsettias and other kinds of materials for her nasal congestion, completely ignoring the impact of tobacco and smoking on her symptoms. A chest x-ray taken on August 5, 2004 showed no evidence of acute disease.

17

On June 22, 2005 in a follow-up appointment with her neurosurgeon, plaintiff reported decreased headaches after having cut her lengthy hair. She stated she had no difficulty walking but complained of weakness. Motor examination of her upper and lower extremities indicated strength of 5/5 bilaterally. Dr. Ellis noted she was doing fairly well with the exception of some mild persistent memory problems, and told Hudson she did not need to report back to see him for another two years. An MRI of her brain on June 23, 2005 revealed no recurrence of the colloidal cyst and the stable appearance of a pineal cyst.

On January 23, 2006, plaintiff visited Dr. Hooks and asked for a permanent disability placard, claiming she had been having difficulty ambulating since her brain surgery. Dr. Hooks also decided plaintiff could stop taking her Fosamax prescription, citing her normal 2004 bone density test.

On February 6, 2006, plaintiff was again examined by Dr. Athar at Virginia Department of Rehabilitative Services. Examination revealed plaintiff had good strength in both legs and normal range of motion in her hips and shoulders. X-rays of the left foot, left knee, left hip, lumbosacral spine, and left shoulder were all negative. In a facsimile provided to Disability Determination Services, Dr. Athar stated plaintiff has the physical capacity to sit, stand and walk for six (6) hours in an eight (8) hour workday, and frequently lift twenty (20) pounds. He also stated she does not need an assistive device. Despite this physical assessment, Dr. Athar concluded that plaintiff's reported problems with anxiety, bad nerves and loss of memory would make working outside of the home difficult for her.

On February 9, 2006, plaintiff had a psychological evaluation report performed at Southwestern Virginia Counseling and Psychological Services. In the report, plaintiff stated her

18

activities included cleaning the kitchen, doing the dishes, vacuuming, mopping the floor and doing the laundry. She complained of having "deformed" feet that cramp. Examination revealed clear speech and thoughts that were well organized, coherent and logical. The examiners found no overt evidence of psychosis. Her fund of knowledge, judgment and insight were all noted to be good, and her abstraction skills were adequate. Testing revealed a full scale IQ of 74, which falls in the borderline range of intellectual functioning. Her memory assessment indicated she had some problem with her working memory, which was noted possibly to be due to concentration and attention difficulties. Her GAF was 54.

The evaluation stated her ability to relate to co-workers, deal with the public, and interact with supervisors is compromised given her self-report of panic symptoms, irritability and anxiety around others. Her abilities to deal with work stressors is fair, as is her ability to concentrate. She showed no limitations in her ability to follow work rules, function independently, or complete detailed or simple job instructions. Her ability to demonstrate reliability in the workplace was assessed as fair to good.

These records are cumulative, and thus do not constitute new evidence as defined by Borders, 777 F.2d at 955. Plaintiff continued to complain of foot cramps and congestion, though no new diagnoses were rendered. She reported a decrease in headaches, and an MRI revealed no residuals or recurrence of the colloidal cyst that was removed in 2002. Plaintiff was even instructed she could discontinue use of Fosamax because her bone density study in 2004 was normal. There is simply no evidence of any new impairments or a decline in her existing impairments that would render her disabled.

19

Though she continues to walk with a cane, Dr. Athar noted Hudson did not need an assistive device. In fact, she reported to the psychological examiner participating in even more strenuous activities than those she originally reported to the ALJ. She stated in her February, 2006 psychological evaluation that she could vacuum and mop the floor, though she previously told the ALJ she could not stand to mop or vacuum, and she must sit to do half of the sweeping. (R. 327) In these additional records, Dr. Athar noted plaintiff had the physical capacity to sit, stand and walk six (6) hours in a workday and frequently lift twenty (20) pounds. This RFC determination is consistent with the findings of both the ALJ, (R. 18), and the state agency physicians, (R. 224). To the extent that Dr. Athar stated at the end of his February, 2006 report that plaintiff would have difficulty working outside the home due to anxiety, nerves and loss of memory, this statement is similar to the conclusion he rendered in his March 26, 2003 report and, also like that 2003 report, lacks a foundation in his clinical findings.

The evidence offered by plaintiff likewise would not change the Commissioner's decision. Therefore, the evidence is not material. In the February, 2006 psychological evaluation report, plaintiff's GAF was determined to be 54. Even if this evidence were to be considered new it would not be material. A GAF score of 54 indicates plaintiff displays some *moderate symptoms* or difficulty in social, occupational, or school functioning. American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. 1994) (emphasis added). The psychological report stated Hudson's ability to relate to co-workers, deal with the public, and interact with supervisors is compromised given her *self*-report of panic symptoms, irritability and anxiety. However, she was noted not to have any limitations following work rules or carrying out detailed or simple job instructions. This functional assessment is consistent with

20

the ALJ's RFC determination, in which she limited plaintiff to simple, repetitive tasks that involve minimal contact with the public. (R. 19) Thus, the ALJ has already considered and taken into account such evidence as contained in the February, 2006 psychological report.

Furthermore, the evidence presented to the court for consideration further demonstrates a number of inconsistencies regarding plaintiff's subjective complaints and supports the ALJ's determination that Hudson lacks credibility. Plaintiff walks with a cane, yet Dr. Athar stated she needs no assistive device. Additionally, plaintiff stated in a June 22, 2005 follow up visit to her neurosurgeon that she was having no difficulty walking. However, on January 23, 2006 she asked her doctor if she could apply for a permanent disability placard because she had difficulty ambulating since her brain surgery. She also stated during her psychological evaluation report that she had deformed feet; other than complaints of cramping, there is no evidence of any deformity in her feet. In fact, Dr. Athar noted that x-rays of her left foot were negative. Finally, plaintiff complained of weakness on June 22, 2005, yet a physical examination revealed strength 5/5 bilaterally. Because this evidence highlights plaintiff's inconsistent complaints and lack of credibility, it likely would not change the ALJ's decision and is therefore not material.

As none of the evidence presented to the court by the plaintiff would warrant a sentence six remand under Borders, the decision of the ALJ is affirmed.

## VI

Accordingly, the decision of the Commissioner is affirmed, and defendant's motion for summary judgment is granted.

In affirming the final decision of the Commissioner, the court does not suggest that plaintiff is totally free of all pain and subjective discomfort. The objective medical record simply

21

fails to document the existence of any condition which would reasonably be expected to result in total disability for all forms of substantial gainful employment. It appears that the ALJ properly considered all of the objective and subjective evidence in adjudicating plaintiff's claim for benefits. It follows that all facets of the Commissioner's decision in this case are supported by substantial evidence. Defendant's motion for summary judgment must be granted.

The Clerk of the Court hereby is directed to send a certified copy of this Memorandum Opinion to all counsel of record.

**ENTER:** This 27 day of July, 2006.

Michael F. Urbanski
United States Magistrate Judge